# Blackstaff Engineering Company v. Commissioners of Sewerage of Louisville.

(Decided March 16, 1912.)

Appeal from Jefferson Circuit Court.
(Chancery Branch, First Division.)

1. Contract—Breach—Mutual Mistake of Parties.—In an action for damages against a contractor for breach of a contract to construct a sewer, evidence examined and held insufficient to support a defense of mutual mistake, or to show that the plans and specifications and a pamphlet entitled "Information for Bidders" were misleading.

2. Contract—Unit Basis—Character of Sub-Soil—Unforeseen Difficulties—Cancellation.—Where a contractor takes a contract for the construction of a sewer on a unit basis, that is, at so much per foot on each item, with an agreement that should he encounter quicksand, springs, disintegrated rock, boulders, or other difficulties, he should have no claim on that account, and it not being within the power of either party to foretell with any degree of accuracy the character of the soil in which the excavation was to be made, the contract was a chancing bargain, and the fact that the contractor, in making the excavations, met with greater or less difficulty than was anticipated by the parties, will not entitle either to a cancellation of the contract.

BODLEY & BASKIN for appellant.

JOHN MARSHALL and WILLIAM W. CRAWFORD for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

The Commissioners of Sewerage of Louisville advertised for bids for the construction of Section F, Beargrass Intercepter Sewer. Upon the original letting there were four bidders, each of whom bid a given price per item on the items indicated in the pamphlet entitled "Information for Bidders." The bids, based upon the price per item multiplied by the quantities estimated by the engineer, were as follows:

Blackstaff Engineering Company .........$34,226.22
Henry Bickel Company ................. 45,337.60
O'Connell ........................... 60,020.55
McCracken ........................... 65,506.33

While the above figures are shown as an aggregate, a lump bid was not made by any contractor; but the final

payment depended wholly upon the quantity of each item that was used. The Blackstaff Engineering Company, being the lowest bidder, was awarded the contract, which was formally executed on January 31, 1910. The Fidelity and Deposit Company, of Maryland, became its surety for the faithful performance of the work, its liability, however, being limited to $8,000.

On March 1, 1910, the Blackstaff Engineering Company commenced work by opening up a shaft just north of Kentucky street. A little later it opened a trench toward the southern part of Section F. It continued work until July 16, 1910, when it threw up the contract. Thereupon the Commissioners of Sewerage advertised for new bids and re-let to Henry Bickel Company, the lowest bidder, at a loss alleged to amount to $20,353.33.

This action was brought by the Commissioners of Sewerage against the Blackstaff Engineering Company to recover the sum of $20,353.33, the difference between the Blackstaff Engineering Company's bid on the estimated quantities, and the bid of the Henry Bickel Company, excluding the amount of work already done by the Blackstaff Engineering Company. The Fidelity and Deposit Company of Maryland was made a party defendant, and recovery asked against it as surety on the bond of the Blackstaff Engineering Company. The defendants resisted recovery on the ground that the contract should be canceled because of a mutual mistake of the parties thereto. The mistakes charged were:

"First. That the plans upon which bids were invited showed borings indicating that the material to be encountered, through which the sewer would run, was blue clay, whereas, it was claimed to be something else.

"Second. That the plans represented that the material to be encountered in the trench was solid, whereas it was soft and semi-fluid.

"Third. That in the approximate quantities, it was estimated by the engineer that 4,100 feet of timber foundation would be required, whereas, in fact, about 22,000 feet of timber foundation was used. It is claimed by argument that this miscalculation caused the defendant to bid less on another item, towit: excavation, than it would otherwise have done."

The answer of the Blackstaff Engineering Company also sought to recover for about $11,000, which it claimed was the reasonable value of the work done by it and not

paid for by the Commissioners of Sewerage. Thereupon the Commissioners of Sewerage filed a reply, denying the affirmative allegations of the answer and pleading certain clauses of the contract in avoidance of the defenses set out in the answer. A rejoinder by the Blackstaff Engineering Company completed the issue. Upon submission of the case, the chancellor gave judgment in favor of the Commissioners of Sewerage against the Blackstaff Engineering Company in the sum of $19,-196.10, and dismissed its counterclaim. Judgment was also rendered against the Fidelity and Deposit Company of Maryland, in the sum of $8,000, the full amount of the bond. Only the Blackstaff Engineering Company appeals.

Appellant, Blackstaff Engineering Company, agreed to do the construction work according to certain plans and specifications. Prior to the letting of the contract, appellees had taken samples of the sub-soil by means of a hand-auger, at points along the line of the work about two hundred feet apart. The locations of these borings are shown on certain blue-prints, numbered 877 and 878. There were other blue-prints, numbered 876, 879 and 880, showing the sewer when constructed. Appellees furnished each of the bidders a pamphlet containing information for bidders, a blank form of proposal, and a contract to be executed by the successful bidder. The material parts of the "Information for Bidders," are as follows:

"The following is an approximate statement of the extent of the work required, based upon the estimate of the engineer; the several bids will be computed, tested and canvassed by the quantities of work given in the statement, viz.:

"Item 1a. Earth excavation and refill depth of cut 22 ft. to 29 ft. 942 linear feet.

"Item 1b. Earth excavation and refill depth of cut 18 ft. to 30 ft. 438 linear feet.

"Item 1c. Earth excavation and refill depth of cut 10 ft. to 23 ft. 1,075 linear feet.

"Item 1d. Earth excavation and refill depth of cut 13 ft. to 30 ft. 748 linear feet.

"Item 5a. Steel for reinforcing concrete (21,400 lbs., should the Commission elect to use plain steel bars.)

"Item 5b or 5c. Steel for reinforcing concrete (21,-300 lbs., should the Commission elect to use deformed steel bars.)

"Item 6. Earth excavation in trench below masonry 40 cubic yards.

"Item 7. Gravel refilling in trench below masonry 40 cubic yards.

"Item 8. Vitrified pipe furnished and delivered.

"Item 11. 8-inch underdrain, 3,203 linear feet.

"Item 12. Timber foundation 4,100 ft. B. M.

"Item 13. Sheeting, bracing and cofferdam timber left in place.

"Item 14. Extra work.

"Item 15. Cleaning up.

"These quantities are based upon the construction of the sewer in open cut, are approximately only, being given as a basis for the comparison of bids, and the Commissioners of Sewerage do not expressly or by implication agree that the actual amount of work will correspond therewith, but reserve the right to increase or decrease the amount of any class or portion of the work as may be deemed necessary by the engineer. * * *

"As the above-mentioned quantities, though stated with as much accuracy as is practicable in advance, are approximate only, bidders are required to submit their estimates upon the following express conditions, which shall apply to and become part of every bid received, viz.:

"BIDDERS MUST SATISFY THEMSELVES, by PERSONAL EXAMINATION of the location of the proposed work, and by such other means as they may prefer, as to the ACTUAL CONDITIONS and requirements of the work and the ACCURACY of the FOREGOING ESTIMATES OF THE ENGINEER, and shall not, at any time after the submission of an estimate of the engineer, dispute or complain of such statement or estimate, nor assert that there was any misunderstanding in regard to the nature or amount of work to be done.

"The excavation, the masonry and other parts of the work have been divided into classes and items in order to enable the bidder to bid for the different portions of the work in accordance with his estimate of their costs, so that in the event of an increase or decrease in the quantities of any particular class of work the actual quantities executed may be paid for at the price bid for that particular class of work."

On the blue-print, No. 877, and the drawing showing the character of the timber foundation is the following:

"Timber Foundation, Where Required."

Section 14 of the contract provides that the sheeting must be placed deep enough not to injure the sewer barrel or adjacent structures, and wherever necessary should be placed below grade. Whether sheeting thus constructed is left in place by order of the engineer, it is to be paid for at the rate of $15 per thousand. There is a rider attached to the contract, which is as follows:

"Timber foundation below the masonry of the sewer will be required whenever or wherever in the judgment of the engineer it may seem necessary. The timber used for this work shall be good sound stock, free from cracks and rot, and of the dimensions shown on the plan or directed by the engineer.

"The longitudinal planks shall be firmly spiked to the cross-timbers and shall be laid so as to bear their entire length upon the bottom of the prepared trench. When deemed advisable, the material in the bottom of trench shall be removed and gravel placed below the foundation.

"Payment for excavation below masonry and the gravel refill will be paid for under the approximate items. The price in Item 12 for timber foundation shall cover the entire cost of furnishing all material necessary and all labor incidental to the placing of the timber in position."

Section 5 of the contract is as follows:

"The location and results of borings made by means of a hand auger or sand bucket on the line of the sewer are shown on the plans. These borings were made substantially at the places shown on the plans, were carried to the depth there indicated, and were made with reasonable care; the materials shown are supposed to be approximately correct. The samples obtained by boring, to be seen at the office of the Commission, are supposed to represent approximately the character of the material to be encountered in the excavations.

"The samples and plots of borings, pipes and other underground objects are supposed to be approximately correct, BUT SHOULD THEY BE FOUND TO BE OTHERWISE, or should the contractor encounter QUICKSAND, SPRINGS, DISINTEGRATED ROCK, BOULDERS, OR OTHER DIFFICULTIES, he shall have no claim on that account, IT BEING UNDERSTOOD that the Commission does not warrant

the samples and plots of underground objects to be correct.''

According to the evidence of appellant's witnesses, the timber foundation required was 22,245 feet B. M., instead of 4,100 feet B. M. This meant that instead of 10 per cent., there was 60 per cent. of excavation in mud. Had the timber foundation been correctly stated, the appellant's bid would have been much higher. The extra cost arising on account of the increased amount of timber foundation required was $15,000. Appellant's witnesses also testify that the plans were misleading, in that they showed that the side sheeting was to go to a certain depth, whereas, it was necessary to carry it below grade. It is also claimed that the drawings represented that the trench to be cut in blue clay throughout, which would afford a firm foundation, and do away with the necessity of timber foundation, whereas, the soil actually encountered was a mixture of blue clay and fine sand, with a large quantity of water therein, thus rendering the soil a semi-fluid. Because of the character of the soil, it was necessary to run the sheeting lower than was indicated upon the blue-print ''Typical Trench Construction,'' and the expense of the work was thereby greatly increased. It developed on cross-examination that appellant's manager, who had put in the bid, had prior thereto done construction work on another sewer where the character of the sub-soil was substantially the same as that found in the sewer in question. It appears, however, that he got his idea that blue clay is dry and affords a firm foundation from the fact that blue clay was of that character in Boston.

According to the evidence for appellees, the plans were not in any sense deceptive or misleading. There was no attempt to indicate the water level on the plans, because that had been found to be impracticable. The plans were intended to represent the different kinds of construction to be encountered, and not to indicate the exact character of the sub-soil that would be met with. The estimate of the timber foundation required was simply given as a basis for bids, and as the bid was by the foot, and the contractor was to be paid on that basis, it was immaterial how much the quantity was. The representations in the plans that the sub-soil was blue clay were true. The samples of the borings taken showed that the soil was blue clay, and the samples

taken during the construction of the sewer showed that the samples from the borings were a fair representation of the character of the sub-soil. There was no attempt to represent on the plans the method and manner of sheeting or bracing the trench. On the contrary, the fact that Section 14 of the contract provided for sheeting below grade, and payment therefor, plainly showed that the picture on the plan No. 877 was not intended as an indication of the depth at which the sheeting should be placed, or as an indication of the character of the sub-soil, but was merely a cross-section of the actual sewer. In our opinion the weight of the evidence upon these propositions is in favor of appellee.

Appellant relies particularly upon the alleged erroneous estimate of the amount of timber foundation required. In this connection he insists that he had the right to assume that the estimates of the engineer were approximate, and it being shown that the amount of timber foundation required was more than five times the amount estimated, this was sufficient to justify the annulment of the contract. In this connection we are referred to the case of Long v. Inhabitants of Athol (Mass.), 82 N. E., 665, where the court held that although the contract provided that a contractor had judged for himself as to all the conditions affecting the cost of the performance of the work, yet a material difference between the estimates of the engineer and the actual amount of work necessary to be done, was sufficient cause for the cancellation of the contract. In that case, however, it does not appear that the contractor bid on each item separately at so much per foot or yard, as the case might be. On the contrary, there was a lump bid for the construction of the sewer. The estimated quantities were very much less than the actual quantities. The items were such as could be computed with reasonable certainty. Such is not the case here. It is not claimed that there is a mistake in any of the quantities that in any way affected the contract. The quantities are estimated with remarkable accuracy. Appellant's whole ground of complaint is, not that the estimated quantity of excavation was incorrect, but that he was misled as to the character of the sub-soil. Having bid on the excavation at so much a foot, the fact that there was more excavation than he anticipated could in nowise affect his contract. His whole case, therefore,

is based upon the theory that the excavation, being in semi-fluid soil, was much more difficult that he anticipated. It seems to us that if the timber foundation item of $4,100 feet of board measure was an indication of the sub-soil, then, for like reason, the 3,203 linear feet of 8-inch underdrain was an indication of the character of the sub-soil. In other words, if the amount of timber foundation indicated a semi-fluid soil of only 328 linear feet, and was an indication that the remainder of the sewer was to be in firm ground, then the fact that an underdrain was to be required of 3,203 linear feet was an indication that water was to be expected throughout the entire length of the sewer. We are not disposed, however, to hold, under the evidence in this case, that either of the above items was intended or understood to indicate the character of the sub-soil in the sewer. On the other hand, we conclude that they are controlled by the further provisions of the contract that timber foundation and under-drains were to be placed wherever and whenever required. It seems to us that appellees furnished appellant all the information that it could possibly furnish. They did not attempt to indicate with any precision, or even approximately, the character of the sub-soil, because, from the very nature of things, it was incapable of definite ascertainment. Appellant entered into the contract with the express understanding that the work was divided into classes and items in order to enable him to bid upon different portions of the work in accordance with his estimate of their cost, so that in the event of an increase or decrease in the quantities of a particular class of work, the actual quantities executed might be paid for at the price bid for that class. Not only so, but he entered into the contract with the distinct understanding that should he encounter quicksand, springs, disintegrated rock, boulders, or any other difficulties, he should have no claim on that account.

Reduced to its final analysis, appellant's complaint is that he encountered difficulties in excavation that he did not anticipate. By the express terms of his contract, this was a risk that he assumed. The appellees not only furnished him with all the information that they had on the subject, but put him on notice that in the event he encountered unforeseen difficuties, he could make no claim on that account. Having taken the work upon a unit basis as to prices, and it not being within

the power of either party to foretell with any degree of accuracy the character of difficulties to be encountered, the contract was a chancing bargain, and the fact that he met with greater or less difficulty than was anticipated by the parties, would not entitle either to a cancellation of the contract. (Hood v. Todd, 139 Ky., 426; Western German Savings Bank v. Farmers and Drovers Bank, 10 Bush, 674; Pomeroy's Equity, 3rd Ed., Vol. 2, p. 1507; The Stanley Miner, 172 Fed., 487.)

Judgment affirmed.